**RECORD NO. 14-4506**

*In The*

# United States Court Of Appeals

## For The Fourth Circuit

# UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

**v.**

# RASHARD CHAZELL CLEVELAND,

*Defendant – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO**

––––––––––––––

**BRIEF OF APPELLANT**

––––––––––––––

**Mark A. Yurachek**
MARK ALLEN YURACHEK
  & ASSOCIATES
**104 North Oak Street**
**Falls Church, VA  22046**
**(404) 441-2262**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. <u>14-4506</u>          Caption: <u>United States v. Cleveland</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Rashard Cleveland</u>
(name of party/amicus)

who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                             ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent
       corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                 ☐ YES ☑ NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____     Date: _____July 10, 2014_____

Counsel for: Appellant _____

## CERTIFICATE OF SERVICE
***************************

I certify that on ____July 10, 2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Frank J. Chut, Jr., Esq.
Assistant United States Attorney
United States Attorney's Office
P.O. Box 1858
Greensboro, North Carolina 27402

_____     _____July 10, 2014_____
(signature)                                              (date)

- 2 -

## **TABLE OF CONTENTS**

**PAGE**:

TABLE OF AUTHORITIES...........................................ii

JURISDICTIONAL STATEMENT.........................................1

STATEMENT OF ISSUE ON APPEAL....................................1

STATEMENT OF THE CASE AND COURSE OF PROCEEDINGS AND
    DISPOSITIONS IN THE COURT BELOW..............................1

STATEMENT OF FACTS...............................................2

SUMMARY OF THE ARGUMENT.........................................8

ARGUMENT AND CITATION OF AUTHORITY..............................9

        STANDARD OF REVIEW......................................9

        DISCUSSION..............................................9

        I.    THE DISTRICT COURT ERRED IN DENYING CLEVELAND'S
              MOTION TO SUPPRESS.................................9

CONCLUSION......................................................20

STATEMENT REGARDING ORAL ARGUMENT..............................21

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

**PAGE(S):**

**SUPREME COURT DECISIONS:**

Brown v. Illinois,
       422 U.S. 590, 95 S. Ct. 2254,
       45 L. Ed. 2d 416 (1975)..............................12, 19

Delaware v. Prouse,
       440 U.S. 648, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979).....10

Florida v. Bostick,
       501 U.S. 429, 111 S. Ct. 2382,
       115 L. Ed. 2d 389 (1991).............................13, 16

Florida v. Royer,
       460 U.S. 491, 103 S. Ct. 1319,
       75 L. Ed. 2d 229 (1983)..............................12, 15

Schneckloth v. Bustamonte,
       412 U.S. 218, 93 S. Ct. 2041,
       36 L. Ed. 2d 854 (1973)..........................11, 12, 15

Terry v. Ohio,
       392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).......11

Whren v. United States,
       517 U.S. 806, 116 S. Ct. 1769,
       135 L. Ed. 2d 89 (1996)..............................10, 14

**FEDERAL APPELLATE DECISIONS:**

   *Fourth Circuit*

United States v. Branch,
       537 F.3d 328 (4th Cir. 2008).........................10, 14

United States v. Brugal,
       209 F.3d 353 (4th Cir. 2000).........................10, 14

United States v. Cunningham,
       546 Fed. App'x. 203 (4th Cir. 2013).......................9

United States v. Digiovanni,
       650 F.3d 498 (4th Cir. 2011).................11, 14, 15, 19

United States v. Duty,
    204 Fed. App'x 236 (4th Cir. 2006)................13, 17, 18

United States v. Jones,
    678 F.3d 293 (4th Cir. 2012)..........................13, 18

United States v. Kelly,
    592 F.3d 586 (4th Cir. 2010)...............................9

**OTHER COURTS:**

   *D.C. Circuit*

United States v. Hall,
    969 F.2d 1102, 297 U.S. App. D.C. 102 (D.C. Cir. 1992)....16

   *First Circuit*

United States v. Chaney,
    647 F.3d 401 (1st Cir. 2011)...............................16

   *Second Circuit*

United States v. Isiofia,
    370 F.3d 226 (2d Cir. 2004)................................16

   *Fifth Circuit*

United States v. Gonzales,
    842 F.2d 748 (5th Cir. 1988)..........................12, 15

United States v. Hurtado,
    905 F.2d 74 (5th Cir. 1990)(en banc)......................12

   *Sixth Circuit*

United States v. Gross,
    662 F.3d 393 (6th Cir. 2011)...............................13

United States v. Jones,
    846 F.2d 358 (6th Cir. 1988)...............................16

United States v. See,
    574 F.3d 309 (6th Cir. 2009)...............................13

   *Seventh Circuit*

United States v. Green,
    111 F.3d 515 (7th Cir. 1997).................13, 17, 18, 19

iii

***Ninth Circuit***

United States v. Crapser,
    472 F.3d 1141 (9th Cir. 2007)..............................16

United States v. Jones,
    286 F.3d 1146 (9th Cir. 2002)..............................16

***Tenth Circuit***

United States v. McSwain,
    29 F.3d 558 (10th Cir. 1994)..............................16

United States v. Caro,
    248 F.3d 1240 (10th Cir. 2001)...................12, 13, 19

***Eleventh Circuit***

Tukes v. Dugger,
    911 F.2d 508 (11th Cir. 1990) cert. denied sub nom
    Singletary v. Tukes,
        502 U.S. 898, 112 S. Ct. 273,
        116 L. Ed. 2d 225 (1991)..............................16

United States v. Miller,
    821 F.2d 546 (11th Cir. 1987)..............................19

United States v. Thompson,
    712 F.2d 1356 (11th Cir. 1983)..............................19

**FEDERAL STATUTES:**

18 U.S.C. § 1028............................................1

18 U.S.C. § 1029............................................1

28 U.S.C. § 1291............................................1

28 U.S.C. § 2255............................................2

**CONSTITUTIONAL PROVISION:**

U.S. Const. amend IV....................................passim

--◆-

## JURISDICTIONAL STATEMENT

The United States Court of Appeals for the Fourth Circuit has jurisdiction over this matter pursuant to 28 U.S.C. § 1291, in that it is an appeal of rulings and a verdict in a criminal case by the United States District Court for the Middle District of North Carolina.

--◆--

## STATEMENT OF ISSUE ON APPEAL

I.   **THE DISTRICT COURT ERRED IN DENYING CLEVELAND'S MOTION TO SUPPRESS**

--◆--

## STATEMENT OF THE CASE AND COURSE OF PROCEEDINGS AND DISPOSITIONS IN THE COURT BELOW

Cleveland was indicted on February 2, 2012, on four counts: two counts of Unauthorized Use of an Access Device (18 U.S.C. §§ 1029(a) & (c)) and two counts of Aggravated Identity Theft (18 U.S.C. § 1028A(A)(1)). [App. 12]. On June 6, 2012, he filed a motion to suppress, to which the government responded. [App. 15 & 22]. The district court, the Honorable Catherine C. Eagles presiding, held a hearing on June 12, 2012, and, at the conclusion of the hearing, entered its findings of fact and conclusions of law, denying the motion. [App. 128-135].[1]

---

[1] Although the court stated at the end of its findings that it would, "ask the clerk to prepare an order denying the motion for the reasons stated in court," the docket does not indicate that such a written order was ever filed. [App. 134].

Cleveland subsequently entered into a plea agreement with the government and entered a plea at a hearing before the district court on July 2, 2012. [App. 145]. The plea agreement specifically reserved Cleveland's right to appeal the denial of his motion to suppress. Id. However, trial counsel failed to file a timely notice of appeal following Cleveland's sentencing. [App. 145]. Cleveland sought relief under 28 U.S.C. § 2255, which was granted by the district court on June 25, 2014. [Doc. 39]. The district court subsequently entered an amended judgment and Cleveland filed a timely notice of appeal. [App. 137 & 143].

This appeal was docketed in the Fourth Circuit on June 26, 2014. On August 20, 2014, Cleveland moved the Court for an extension of time in which to file his brief and that motion was granted. Cleveland sought and received a second extension in time on September 19, 2014. Cleveland now timely submits his appellate brief and appendix.

**STATEMENT OF FACTS**

On the afternoon of January 20, 2012, Officers John Matthews and E.A. Crozier of the Greensboro Police Department, were on patrol in an unmarked vehicle in the area of Veasley Street and Isler, an area, "where Greensboro Police have a high incident of arrests … [p]rimarily for narcotics and prostitution." [App. 50]. Matthews observed Cleveland driving a "gray Toyota Camry with New Jersey registration." [App. 51].

According to Matthews, when Cleveland saw the officers, he, "sat up in his seat and put his hands on two and ten and stared at Officer Crozier and myself. When he sat up, I observed he was not wearing a seat belt." Id. Crozier speculated that Cleveland was, "trying to discern if we were a police vehicle or not." [App. 70].

The officers followed Cleveland into the parking lot of a nearby hotel and initiated a traffic stop, "[t]o investigate the seat belt violation." [App. 52; 71]. When Cleveland pulled into a parking space, the officers, "pulled behind him." [App. 84; 92-93]. Matthews did not observe any other traffic violations, but Crozier claimed that the officers did not initiate the stop until after Cleveland passed them and, "made a quick erratic left turn into the first parking lot he came to," which was the parking lot of the hotel where he was a guest. [App. 52; 71].

Both officers approached the vehicle and Matthews, "told the driver that I stopped him for driving without wearing a seat belt." [App. 52]. Cleveland gave the officers his valid driver's license and the rental agreement for his vehicle, which reflected that he had rented it the previous day in Atlanta, and, "advised that he was visiting his daughter, who lives with his daughter's mother in Greensboro." [App. 53].

Matthews took Cleveland's license and rental agreement and ran several records checks, including, apparently, a criminal

background check, which he testified are run, "during every traffic stop," [App. 54; 63]. The records check showed that Cleveland, "had an active license and he had been charged[2] with possession with intent to sell and deliver marijuana in 2005." [App. 55]. The records also showed that there were no active warrants out for Cleveland. [App. 63]. Crozier had remained at the car with Cleveland and testified:

> Mr. Cleveland, he appeared nervous. He seemed to exhibit a heavy rise and fall of his chest. His hands were shaking. A lot of these things are common just in something as routine or as simple as a traffic stop for a seat belt violation, but that nervousness typically subsides provided there is nothing lese present. [App. 74].

Crozier claimed that Cleveland's, "nervousness never ceased throughout the stop." [App. 74; 104]. In seeming contradiction of his assurances that this was merely a stop for a seat belt violation, Crozier interrogated Cleveland, he originally testified, "mainly about his business in Greensboro," where Cleveland had attended college. [App. 75]. Cleveland testified that Crozier also made him open an eyeglasses case to show him what was inside. [App. 105]. Though he made no mention of this on direct, on cross-examination, Crozier admitted: "one of the things I always ask people is, have you ever been arrested, have you ever been charged with anything." [App. 89].

---

[2] As was clarified on cross-examination, there was no conviction, merely a charge, for possession with intent to sell and deliver marijuana. [App. 64].

[a]t that point, Mr. Cleveland had said 'several years ago I had a marijuana charge.' This was completely independent of Officer Matthews learning about the intent to sell and deliver charge while he was in the vehicle by himself. I had no knowledge of that.

In speaking to Mr. Cleveland and him saying he had a previous marijuana charge, one of the expectations of my job is to investigate narcotics. When somebody tells me that they have had a narcotics charges, oftentimes they will downplay it as much as they can. I don't know whether it is a trafficking charge, an intent to sell and deliver charge or simple possession charge.

At that point, I attempted to clarify that with Mr. Cleveland, by asking him, 'was it a simple possession or was it for possession with intent to sell and deliver?" At that point, he grew agitated, merely about the line of questioning, responding, 'I do not sell marijuana.' Id.

Aware of the information gleaned from the records check, Matthews, "returned to Mr. Cleveland's driver's side window, had him exit the vehicle so I could explain the situation to him." [App. 55; 76]. Crozier claimed to have, "tried to put him at ease by explaining to him this is customary, Officer Matthews is asking you to the rear of the vehicle to speak with you, you are not under arrest." [App. 78]. Matthews and Crozier did not interact between the records check and Cleveland's removal from the vehicle. [App. 65; 66; 87] but see [App. 107]. While this was happening, a third officer, R.H. Coggins, arrived in a

separate vehicle and joined the group. [App. 56; 77]. With the other two officers present,[3] Matthews then:

> [e]xplained to Mr. Cleveland I was going to give him a verbal warning regarding the seat belt violation. I handed his driver's license and the rental agreement back to him. I stated 'now that part is over [in reference to the traffic stop], you are free to go, but do you mind if I ask you about something else? And he said, 'yes, that's fine.'" [App. 54].

Crozier testified that, after Matthews gave Cleveland his license and rental agreement, "Mr. Cleveland was turning as if he was going to return to the vehicle," before Matthews called him back to ask more questions. [App. 77]. Cleveland testified that Matthews never told him he was free to leave, but, "[h]e merely told me, this part was done." [App. 113]. Up to that point, Matthews agreed that he had no reasonable suspicion that Cleveland was engaged in any criminal activity. [App. 67]. Cleveland testified that he felt compelled to answer Matthews's questions at that point:

> there was three officers there and they were really, you know, aggressive as far as, you know trying to find something more about me, and this was – just felt a lot of pressure. [App. 108].

Matthews told Cleveland:

> [j]ust some things drew my attention to him as he was crossing the intersection, such as the fact he stared at us, sat up in the seat, put his hands at two and ten. He said, 'I didn't realize you were cops until you got out of your car,' and this contradicted what

---

[3] Crozier and Coggins were, "on the opposite side of the vehicle." [App. 68].

he had said earlier about him pulling into the first space. [App. 57; 61].

From there, Matthews:

> just continued by asking him about the charges that he received in 2005, which was possession with intent to sell and deliver marijuana. I just asked if he was done with all that nonsense. I just asked, 'are you done with all that.' He advised that he never sold marijuana, but he had just been charged with it. Then I asked, 'then you don't have anything illegal on you, right?' He said, 'no.' And then he stated, 'you can check, too.' Clarifying, I then asked, 'so we can search you and your car?' [App. 58-59].

According to Matthews, Cleveland responded, "yes." [M. 59]. Cleveland clarified that he, "consented to him searching my person and they insisted on searching the car." [App. 113; 110-111]. There is no record of the officers informing Cleveland that he was free to refuse consent to search. Cleveland never felt free to leave the situation, explaining:

> [f]rom my understanding of the way I felt, like I was surrounded by police officers. After he gave me my license back, it was never calm emotion where they were going to their cars. They all stood there and they kept asking me questions, so I really didn't feel like I could leave while, you know, they searched the car. [App. 111].

Crozier commented that Matthews, "brought up the previous drug charge of Mr. Cleveland's, confirmed that he was done with that lifestyle or with any type of things of that nature. Mr. Cleveland said he was. He almost – I don't want to say Mr. Cleveland took offense to it, but it was, you know, 'go ahead and check.'" [App. 79]. Matthews claimed that Cleveland did not,

7

"put any limitations on the search," nor did he at any point object to or try to limit the search (M. 14-15).

Crozier, "informed [Coggins] that we had consent[4] to search the vehicle," and they proceeded to search the car while Matthews searched Cleveland personally. (M. 14-15; 35; 50). Inside the car, Coggins discovered a closed book bag in the back seat of the car. (M. 15; 47; 50). Coggins opened the book bag without asking Cleveland's permission to do so. (M. 47). Once opened, Coggins, "observed a slight odor, from my training and experience, of marijuana. I continued searching through the smaller pockets and found a small pocket at the top of the book bag near the handle." [App. 96]. Crozier stated that Coggins:

> located four, $200 Visa gift cards which were still in the original packaging, a large stack of credit cards, and a Florida driver's license bearing Mr. Cleveland's picture. The credit cards and ID all bore the name Michael Thomas, which was clearly difference from the name that Mr. Cleveland had provided us initially on that North Carolina driver's license. [App. 81-82; 60; 61; 96].

At that point, the officers agreed that Cleveland was under arrest.

--◆--

## SUMMARY OF THE ARGUMENT

The district court erred in denying Cleveland's pretrial motion to suppress. Contrary to the court's finding, Cleveland's

---

[4] Coggins did not hear Cleveland give consent to search. [App. 99].

consent was coerced by officers who detained him after completing the purpose of his original stop, to cite him for driving without a seatbelt.

--◆--

## ARGUMENT & CITATION OF AUTHORITY

### STANDARD OF REVIEW

"In considering the denial of a motion to suppress, we review the district court's legal determinations *de novo* and its factual findings for clear error, viewing the evidence in the light most favorable to the government." United States v. Cunningham, 546 Fed. Appx. 203 (4th Cir. 2013)(citing United States v. Kelly, 592 F.3d 586, 589 (4th Cir. 2010)).

### DISCUSSION

**I.    THE DISTRICT COURT ERRED IN DENYING CLEVELAND'S MOTION TO SUPPRESS**

The district court found:

[a]fter the drivers license was returned to the Defendant, at that point the Defendant was free to leave and there is – certainly officers are allowed to talk with people in that circumstance in a consensual manner. The officers asked the Defendant if they could talk to him. The Defendant agreed to talk to them.

There was nothing unusual about the circumstances that would make a reasonable person feel like they were not free to leave, especially when the officer just said he was. The officers had a couple of times during the proceedings, assured him that this was just a routine traffic stop, while there were some questions about drugs, they were not excessive or intimidating in any way.

9

> The Court finds that the consent given by the Defendant was voluntary. Based on all the circumstances, there was no Fourth Amendment violation, and Defendant's motion to suppress is denied. [App. 134-35].

"Temporary detention of individuals during the stop of an automobile by the police … constitutes a 'seizure' within the meaning of the Fourth Amendment." Whren v. United States, 517 U.S. 806, 809, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996). See also Delaware v. Prouse, 440 U.S. 648, 653(III), 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. at 810. The stop may be pretextual: "the constitutional reasonableness of traffic stops [does not] depend[] on the actual motivations of the individual officers involved." Whren at 814.

Although a traffic violation, "provides sufficient justification for a police officer to detain the offending vehicle," he is only justified in doing so, "for as long as it takes to perform the traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). An officer may, "request a driver's license and vehicle registration, run a computer check, and issue a citation." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000). See

also United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011).

However, that "the police officer's action was justified at the inception," is merely the first part of a two part analysis that this Court employs under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), concerning the reasonableness of a traffic stop. Digiovanni, 650 F.3d at 506. "If a police officer seeks to prolong a traffic stop to allow for investigation into a matter outside the scope of the initial stop, he must possess reasonable suspicion or receive a driver's consent." Digiovanni, 650 F.3d at 507. "[W]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." (citations and internal quotes omitted) Schneckloth v. Bustamonte, 412 U.S. 218, 223(II), 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

> whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent — the legitimate need for such searches and the equally important requirement of assuring the absence of coercion. Schneckloth, 412 U.S. at 227(II)(B).

11

Thus, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth, 412 U.S. at 233(II)(B).

Consent to search is not valid if the citizen is being illegally detained. See e.g. Florida v. Royer, 460 U.S. 491, 506(V), 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)(plurality opinion). Furthermore, as Schneckloth noted, although it is not _decisive_, whether or not officers advised the suspect that they had a right to refuse consent "is a critical factor in any voluntariness analysis." United States v. Gonzales, 842 F.2d 748, 755(II)(B)(5th Cir. 1988) overruled on other grounds United States v. Hurtado, 905 F.2d 74 (5th Cir. 1990)(en banc).

> [w]hen there has been such a [Fourth Amendment] violation the government bears the heavy burden of showing that the primary taint of the violation was purged. To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent. United States v. Caro, 248 F.3d 1240, 1243 (10th Cir. 2001).

Under such circumstances, the Tenth Circuit noted that:

> the factors set forth in Brown v. Illinois, 422 U.S. 590, 603-04, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), are especially important: (1) the temporal proximity of

12

the illegal detention and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. <u>Caro</u>, 248 F.3d at 1247(B).

Pulling behind a vehicle with emergency lights activated and blocking its exit from a location, "display[s] an unmistakable show of authority that would give a reasonable person the impression that he was not free to leave," and any subsequent encounter between police and a citizen under those circumstances is not consensual. <u>United States v. Duty</u>, 204 Fed. App'x 236, 239 (4th Cir. 2006). <u>See</u> <u>also</u> <u>United States v. Gross</u>, 662 F.3d 393, 399-400 (6th Cir. 2011)(citing <u>United States v. See</u>, 574 F.3d 309, 313 (6th Cir. 2009)). By "blocking [a citizen] from moving his vehicle," this Court has held that, "before the verbal encounter even beg[ins], [the stop] lack[s] the traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer." <u>United States v. Jones</u>, 678 F.3d 293, 300(III) (4th Cir. 2012)(citing <u>Florida v. Bostick</u>, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)). <u>Jones</u> cited <u>United States v. Green</u>, 111 F.3d 515, 520 n.1 (7th Cir. 1997), which likewise noted that, "officers pulled their car in behind the Greens, blocking the car's exit. Under these circumstances, a reasonable person would not feel that he was free to leave. Thus, for purposes of the Fourth Amendment, the officers stopped the Greens – it was not a consensual encounter." (cites omitted).

Although the officers' initial stop of Cleveland smacks of pretext, he concedes that the stop for a seatbelt violation was "reasonable" as that term is contemplated in the relevant authorities. Whren at 814. Likewise, there is no dispute in the record that, when Matthews sought Cleveland's consent to search the vehicle, the, "traditional incidents of a routine traffic stop," had been completed with regard to the seatbelt violation. Branch, 537 F.3d at 335. See also Brugal, 209 F.3d at 358. At that point, Matthews conceded that he had no reasonable suspicion that Cleveland was engaged in criminal activity beyond not wearing a seatbelt. [App. 67]. Cleveland contends that the investigative stop was prolonged "outside the scope of the initial stop" and without reasonable suspicion or Cleveland's voluntary consent when Matthews compelled him to remain after returning his license and rental agreement. Digiovanni at 507.

The point at which Cleveland contends the stop was prolonged beyond its initial purpose was after Matthews returned his documents and issued a warning for the seatbelt violation. Matthews testified that he stated, "now that part is over, you are free to go, but do you mind if I ask you about something else?" [App. 54]. Cleveland headed toward his car, but came back on Matthews's command. [App. 77]. Because the officers lacked reasonable suspicion that Cleveland was engaged in any other

14

criminal activity, the subsequent search could only have taken place with Cleveland's voluntary consent. See Digiovanni, supra.

The government will argue that it has satisfied its burden to show that Cleveland's consent was freely and voluntarily given by pointing out that Matthews informed Cleveland that his seizure had ended and he was free to leave. [App. 54]. This testimony – which was disputed – is not dispositive of the question of voluntariness. See Schneckloth at 227(II)(B). Cleveland believes that the totality of the circumstances indicates that the district court erred in concluding that his consent was voluntarily given and not the product of coercion. See Royer, 460 U.S. at 506(V)(noting that consent to search is not valid when it is given during an unlawful detention).

Several factors mitigate against the Court affirming the district court's finding that "the consent given by the Defendant was voluntary." [App. 135]. Cleveland notes that none of the officers informed him that he was under no obligation to consent to a search of his person or his vehicle. See Gonzales, 842 F.2d at 752(II)(B). Because it is well established that the voluntariness of Cleveland's consent is proved or disproved by considering the totality of the circumstances, he is not contending that this fact, standing alone, is dispositive. See Schneckloth at 227(II)(B). However, Cleveland joins several

15

Circuits[5] and the Supreme Court in asserting that it is highly relevant that this factor is lacking. Id. See also Bostick, 501 U.S. at 432 (observing that informing a defendant of his right to refuse consent is a factor, "particularly worth noting").

When the stop was initiated, Matthews and Crozier allowed Cleveland to park at his hotel and then, "pulled behind him." [App. 84; 92-93]. Coggins later joined the group in a second vehicle. [App. 56; 71]. The record does not show that the officers ever moved their vehicles during the stop. The time lapse between Matthews allegedly telling Cleveland he was free to go and his continued questioning about drugs was instantaneous and, therefore, there was no time for the officers to move their vehicles once Cleveland was allegedly free, but before they attempted to search his person and his vehicle. Thus, when Matthews allegedly informed Cleveland that he was free to leave, two police vehicles remained parked behind Cleveland's vehicle and, even as he "turn[ed] as if he was going to return to the vehicle," he could not depart in his vehicle

---

[5] See United States v. Chaney, 647 F.3d 401, 408(II)(B)(1st Cir. 2011; United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004); United States v. Jones, 846 F.2d 358, 360-61 (6th Cir. 1988); United States v. Crapser, 472 F.3d 1141, 1149(B) (9th Cir. 2007)(citing United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002)); United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994); Tukes v. Dugger, 911 F.2d 508, 517-18 (11th Cir. 1990) cert. denied sub nom Singletary v. Tukes, 502 U.S. 898, 112 S. Ct. 273, 116 L. Ed. 2d 225 (1991); United States v. Hall, 969 F.2d 1102, 1108 n.7, 297 U.S. App. D.C. 102 (D.C. Cir. 1992).

without the officers *allowing* him to leave by clearing the way. [App. 77]. Cleveland testified that he gave consent to search because, "I was surrounded by police officers." [App. 111]. He pointed out that the officers, rather than, "going to their cars," instead, "all stood there and they kept asking me questions." [App. 111]. The "officers pulled their car in behind [Cleveland], blocking the car's exit. Under these circumstances, a reasonable person would not feel that he was free to leave. Thus, for purposes of the Fourth Amendment, the officers stopped [Cleveland] – it was not a consensual encounter." Green, 111 F.3d at 520 n.1.

Before and after Matthews allegedly said he was free to leave, there remained, "an unmistakable show of authority that would give a reasonable person the impression that he was not free to leave." Duty, 204 Fed. App'x at 239. Crozier questioned Cleveland about matters wholly irrelevant to the original purpose of the stop, to wit: his criminal history, as Matthews ran a computer check (for the purpose of getting the same information in part). This brings into question the necessity of Crozier's questions (since his partner testified that a background check was a routine part of the stops they made), for any purpose *other than* pressuring Cleveland and/or trying to cause him to act nervous. [App. 54, 63].

17

Moreover, during the stop, Crozier ordered Cleveland to open an eyeglasses case to see if there were drugs inside without telling him he could refuse that command. These actions also established "an unmistakable show of authority" by police over Cleveland, notably making Cleveland feel compelled to allow them to search a container inside his vehicle. _Duty_ at 239. These assertions of authority, Cleveland contends, essentially laid the groundwork for officers to compel Cleveland to let them search the vehicle moments later.

Even "before the verbal encounter even began," the stop, "lacked the traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of a police officer," because Crozier and Matthews had blocked Cleveland's car into a parking space with their own vehicle, subsequently joined by Coggins. _Jones_, 678 F.3d at 300(III). Certainly once the officers had redundantly questioned him about past arrests _and_ run his criminal record, then forced him to allow a search of a container inside his vehicle, a reasonable person would have understood that Cleveland was being investigated for a crime far more serious than a seatbelt violation and was subject to the officers' authority, which they could freely wield because he had no way of driving away. See _Duty_, _supra_.

It is not relevant that Cleveland was a registered guest in the hotel where the vehicle was then penned in. In _Green_, the

Seventh Circuit found a detention unlawful even though, by the time the occupant was seized, he was, "walking toward [a] house." 111 F.3d at 517(I), 520(II)(A). Cleveland testified that he was, "surrounded," by the officers and their vehicles, which in turn made him feel compelled to answer Matthews's continued, unwarranted questions. Cleveland was therefore being illegally detained by officers who conceded that, once the seatbelt warning had been issued, he did not suspect that Cleveland was engaged in criminal activity. [App. 67]. See also Digiovanni, supra.

Because Cleveland can establish that his consent was coerced, rather than voluntary, this Court should consider the factors identified in Brown, 422 U.S. at 603-04, to determine if the consent was sufficiently attenuated to the Fourth Amendment violation to remove the taint. Caro at 1247(B). As noted, *supra*, the burden is on the government to remove this taint and that burden is, "heavy." Id. at 1243.

As to, "the temporal proximity between the illegal detention and the consent," it was immediate. Brown at 603-04. The relationship between the unlawful detention and the coerced consent can best be summarized by the Eleventh Circuit's summary of the facts in United States v. Miller, 821 F.2d 546, 550(II)(C)(11th Cir. 1987)(quoting United States v. Thompson, 712 F.2d 1356, 1362 (11th Cir. 1983)): "there was no significant

19

lapse of time between the unlawful detention and the consent, []
no intervening circumstances dissipated the effect of the
unlawful detention, and [] the officer's conduct, while not
flagrant, had no arguable [legal] basis." (internal quotes
omitted).

The government, therefore, cannot overcome its "heavy"
burden to show that Cleveland's consent was not the product of
coercion and, therefore, the trial court erred in suppressing
the fruits of the subsequent search of his vehicle and backpack.

--◆--

## CONCLUSION

**WHEREFORE**, Cleveland respectfully requests that this
Honorable Court **reverse** the Court's denial of his motion to
suppress, **vacate** Cleveland's plea and sentence and **remand** the
case to the district court for proceedings consistent with its
decision.

--◆--

## STATEMENT REGARDING ORAL ARGUMENT

Cleveland respectfully requests oral argument in this matter. The issue involved will turn largely on the facts of the case and Cleveland believes that the Court would benefit from the attorneys' assistance in specifying the facts relevant to the Court's decision.

This 6 day of October, 2014.

Respectfully Submitted,

Mark A. Yurachek
Mark A. Yurachek, Esq.
Virginia Bar No. 66093
MARK ALLEN YURACHEK
   & ASSOCIATES
104 North Oak Street
Falls Church, VA  22046
(404) 441-2262

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**
**Certificate of Compliance with Type-Volume Limitation,**
**Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed.
    R. App. P. 32(a)(7)(B) because:

        this brief contains 4,764 words, excluding the parts
        of the brief exempted by Fed. R. App. P.
        32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.
    R. App. P. 32(a)(5) and the type style requirements of Fed.
    R. App. P. 32(a)(6) because:

        this brief has been prepared in a non-proportional
        spaced typeface using Microsoft Word in 12 point
        Courier New.

October 6, 2014          /s/ Mark A. Yurachek_____
                         Mark A. Yurachek, Esq.
                         Virginia Bar No. 66093
                         MARK ALLEN YURACHEK
                            & ASSOCIATES
                         104 North Oak Street
                         Falls Church, VA  22046
                         (404) 441-2262

                         *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 6, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Angela H. Miller
OFFICE OF THE
    UNITED STATES ATTORNEY
101 South Edgeworth Street
Greensboro, NC  27401
(336) 333-5351

*Counsel for Appellee*

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Shelly N. Gannon
Shelly N. Gannon
GIBSON MOORE APPELLATE SERVICES, LLC
421 East Franklin Street, Suite 230
Richmond, VA  23219